

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 4:15CR109 |
| | § | |
| CHRISTOPHER TUTOR (5) | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

On September 28, 2015, the Court held a hearing on Defendant's Motion to Suppress Evidence (Dkts. 51 & 52).[1] Having considered the evidence presented, the Court recommends that the motion be DENIED.

Defendant is charged in this drug conspiracy case with a violation of 21 U.S.C. § 3, Accessory After the Fact. Specifically, it is alleged that Defendant remotely deleted the contents of a co-Defendant's (his brother, Gildner) iPhone and iPad while Gilder was incarcerated and the investigation into the charges against him was ongoing.

In the motion, Defendant seeks to suppress all tangible evidence seized by law enforcement officers or others in connection with his detention and arrest, all written and oral statements made by Defendant to any law enforcement officers or others in connection with this cause, and any testimony by law enforcement officers or others about such evidence or statements.

Defendant argues that he was arrested and detained at his home in an "ambush" style raid and was not given a reasonable opportunity to consult with an attorney before speaking with officers.

---

[1]Although two separate documents were filed, they appear to be substantively identical and raise the same argument for suppression.

Defendant attaches to his motion a copy of a signed January 16, 2015 "Advice of Rights" form and a signed January 16, 2015 "Voluntary Statement" completed by Defendant. *See* Dkts. 51-1 –51-2. In his motion, Defendant argues that portions of the Advice of Rights form were not completed by him. Defendant also argues that, other than this document, "[t]he Government has not provided any audio or visual evidence of Mr. Tutor's waiver of his rights" and that "any reasonable person would have felt threatened and coerced by the conduct of the agents that descended upon Mr. Tutor that day." Dkt. 51 at 2.

The Government responds that Defendant voluntarily gave a statement to law enforcement at his home during the execution of a search warrant at Defendant's home. According to the Government, Defendant was not arrested after giving the statements, was not in custody when he voluntarily made the statements to law enforcement, and freely went to work after the execution of the search warrant was completed.

According to the record before the Court, Defendant gave the statements at issue to law enforcement in January 2015, was not indicted until June 2015, and was not arrested until June 2015.

**EVIDENCE PRESENTED**

At the hearing, the Government offered the testimony of Wes Menser, a task force officer with the D.E.A. Menser testified that he investigated co-Defendant Gildner (Defendant's brother) who is an alleged participant in a methamphetamine distribution conspiracy. When Gildner was arrested, pursuant to a search warrant, agents seized electronic devices, including an iPhone and an iPad.

2

According to Menser, agents listened to one recorded jail call in which co-Defendant McCune notified co-Defendant Gildner that his devices had been deleted and one call during which Defendant notified Gildner that he had "wiped" Gildner's devices. Based on these calls, agents obtained a search warrant for Defendant's residence.

Although agents were not concerned about any methamphetamine use by Defendant, Menser testified that they were concerned that Defendant had firearms. The Government offered a photograph of Defendant holding an assault rifle and a copy of the search warrant and affidavit for Defendant's home. Police conducted surveillance on the home and ultimately stopped Defendant nearby his home for a traffic violation.

Menser arrived shortly after the traffic stop, notified Defendant of the existence of the search warrant for his home, and asked Defendant to accompany officers to the execution of the warrant so that officers did not have to breach and damage the door in executing the warrant. According to Menser, Defendant was frisked but not handcuffed and rode in the front seat of Menser's car back to his home. The drive was less than half a mile.

According to Menser, when they arrived at the house, Defendant had questions about why officers were there and Menser offered to sit down with him and talk about it. Menser testified that he sat with Defendant at his kitchen table. According to Menser, Defendant was not restrained at any time, was free to leave, was told he was free to leave, and called his office to notify co-workers that that he would be late. Menser testified that only he sat at the table with Defendant during the interview but that another investigator also witnessed the conversation. According to Menser,

3

approximately 10 other officers searched Defendant's home while they visited.

Menser testified that he and Defendant had a cordial and "laid back" tone while conversing at the kitchen table. According to Menser, Defendant was polite and cooperative and provided all passwords when asked to do so by other officers. Menser testified that he was wearing street clothes, a "Police" jacket and a bullet proof vest but felt comfortable at Defendant's home and removed the vest there. Menser left the jacket on because he was cold.

According to Menser, Defendant's girlfriend was waiting in the home's office with the door open. Menser testified that Defendant's dogs were roaming freely in the house and that he and Defendant even had a cordial conversation about them.

According to Menser, Defendant stated that he was educated and understood the English language. Menser testified that officers let Defendant review the Advice of Rights form, and Defendant then signed the form. Menser could not recall whether the form was read aloud to Defendant or whether Defendant answered verbally the questions on the form regarding whether he understood his rights or whether he was willing to ask questions. According to Menser, he could not recall who signed the check box on the form, but Defendant signed the form. Menser signed the form as a witness. According to Menser, it is not common practice to have individuals initial the questions on the Advice of Rights form.

Menser testified that after Defendant signed the Advice of Rights form, Defendant then verbally told Menser that McCune asked him to wipe Gildner's phones. Menser then had Defendant complete a written statement to reflect what they discussed. According to Menser, Defendant wrote

the statement himself and placed his initials next to each warning at the top of the Voluntary Statement form. Menser sat with Defendant at the kitchen table while Defendant completed the form. According to Menser, Defendant completed the Voluntary Statement form less than an hour after he initially signed his Advice of Rights form.

At the conclusion of the interview, Menser told Defendant that he would not be arrested that day and Defendant's devices were returned to him. Agents left the home, and Defendant told them that he was going to work. Defendant's case was not referred to a grand jury until six months later.

Menser testified that, during the course of their conversation at the kitchen table, Defendant did not invoke his right to remain silent or ask for a lawyer. Menser did not recall Defendant asking "do I need a lawyer?" or Defendant using the words "free to leave." To Menser's knowledge, Defendant made the oral and written statements freely and voluntarily.

At the hearing, Defendant then called Investigator Jeff Brownrigg, an investigator with Collin County Sheriff's Office. Brownrigg testified that he was present during the execution of the search warrant and present in the kitchen when Defendant was being interviewed. Brownrigg could not remember whether he was standing or seated, but believed it could have been both. Brownrigg testified that he was carrying a gun but that it was not visible.

As to Defendant's girlfriend, Brownrigg could not recall whether anyone directed her to remain in the home office separate from Defendant or whether anyone told her that she was free to leave, but Brownrigg testified that she was, in fact, free to leave.

Brownrigg testified that Defendant was advised of his rights initially upon entering the house. According to Brownrigg, Defendant was free to leave although he conceded that he did not tell Defendant that. Brownrigg also witnessed and signed the Advice of Rights form signed by Defendant. Brownrigg testified that officers spoke to Defendant for a while after he executed the Advice of Rights form and before he completed the Voluntary Statement and that it took approximately 20 minutes to complete the Voluntary Statement. Brownrigg testified that he did not believe anyone directed Defendant to write (or suggested to Defendant) anything specific in his written statement. Like Menser, Brownrigg also did not recall Defendant asking whether he needed a lawyer.

Defendant also testified at the hearing. Defendant conceded that he signed both forms. According to Defendant, after he was pulled over in the traffic stop and was advised of the search warrant, he returned to his house with officers and sat down with them at his kitchen table. Defendant testified that he did not feel free to leave the scene of the traffic stop and was not permitted to drive his vehicle back to his house but instead rode with an officer. According to Defendant, the officers at the traffic stop were nice to him. Defendant conceded that he knew that he was going to go to work at some point that day because he called in to say he would be late and that he went to work after officers left.

Defendant estimated that there were approximately 20 people at his home executing the search warrant. Defendant testified that he did not feel free to leave his home while the officers were there and that he was nervous and scared when he was talking to officers. Defendant conceded that

he was never explicitly told that he could not leave or could not go to work.

Defendant testified that he is college educated and graduated with honors with his associate's degree and also obtained a bachelor's degree. Defendant was also a Marine and conceded that he completed many forms while he served as a Marine. According to Defendant, before he signed the Advice of Rights form, he asked if he needed a lawyer and he believes officers told him not to worry about and that it would go faster without a lawyer.

Defendant conceded that he read and signed the warnings regarding his right to a lawyer. According to Defendant, he signed the Advice of Rights form "in the moment" and after he asked about needing a lawyer. Defendant testified that he read the Advice of Rights form but does not believe he understood it. According to Defendant, he was scared. Defendant testified that he was ready for officers to get out of his house.

Defendant further conceded that he initialed all the warnings in the Voluntary Statement and that the entire Voluntary Statement is in his handwriting. He further testified that he believes that he read the warnings in the Voluntary Statement. According to Defendant, officers told him to put "something about the feds" in the statement. Defendant conceded that McCune told him that she "didn't want the feds to go through it" but he thought that it was because there was pornography on his devices.

Defendant conceded that he never directly asked for a lawyer and was never denied a lawyer. Defendant further testified that although he does not now feel that he was advised of his rights to a lawyer he "guesses he was" advised of his rights.

**ANALYSIS**

The Fifth Amendment protects an individual's right to be free from compelled self-incrimination. Thus, the Government may use at trial only those confessions that are voluntarily made. 18 U.S.C. § 3501(a); *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). To protect this right, statements obtained during a custodial interrogation of an accused cannot be used unless the accused has been advised of his right to remain silent and right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 473 (1966). The requirement of *Miranda* that police advise an accused of his rights prior to questioning applies only if the accused is "in custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 445; *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The determination of whether a person is in custody for *Miranda* purposes must be made on a case-by-case basis considering all the objective circumstances. *Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526. A suspect is "in custody" for the purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Courtney,* 463 F.3d 333, 337 (5th Cir. 2006) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988)).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 100 S. Ct. 1682, 1689–90, 64 L. Ed.2d 297

(1980). As such, when the subject of the questioning transformed from routine questioning to questions calculated and intended to elicit a criminally incriminating response, an interrogation is considered to have commenced for purposes of *Miranda*. *See id.*; *see also U.S. v. Chavira*, 614 F.3d 127, 133, n8 (5th Cir. 2010).

Having considered the testimony presented, the Court finds that the questioning of Defendant during the search of the home did not constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. No reasonable person in Defendant's position, having allowed officers entry into the home and called into work to say that he would be late, would have believed that his freedom was so restrained that he was in custody for purposes of *Miranda*. Even if Defendant was not specifically told that he was "free to leave," there is nothing to suggest that he was prevented from leaving; and the search of his home would have been conducted pursuant to the search warrant regardless.

More importantly here, there was a clear and knowing waiver of his rights. In order for the Government to introduce Defendant's statements, it generally must prove that the accused voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. at 436. To prove a valid waiver, the Government must show that the relinquishment of a defendant's rights was voluntary and that the defendant was fully aware that the right was being waived and the consequences of waiving that right. *Id.*

The Government has offered two separate forms signed by Defendant indicating such a waiver. Defendant does not dispute signing both the Advice of Rights form and the Voluntary

Statement. The January 16, 2015 "Advice of Rights" form – noted as a Form DEA-13 in its footer– sets forth Defendant's rights and has a check mark by the provision "__✓__I Have read or ___ someone has read to me this advice of rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer questions without a lawyer present." Dkt. 51-1. The signed January 16, 2015 "Voluntary Statement" completed by Defendant again sets forth his rights and is initialed with "CAT"– Defendant's intials. Dkt. 51-2.

According to the testimony presented, the tone of the conversation was cordial, no weapons were brandished, and the Voluntary Statement is in Defendant's handwriting and is initialed by Defendant himself. The Court finds that whether an officer or Defendant placed the check mark in the Advice of Rights form is irrelevant because it is undisputed that Defendant in fact read the form, rather than someone else reading it to him. The relevant and undisputed fact as to the Advice of Rights form is that Defendant signed it and read it.

Even assuming these warnings were not read aloud to Defendant, that they were presented to him in writing is enough to satisfy *Miranda*. *United States v. Venegas,* 594 Fed. App'x 822, 828 (5th Cir. 2014) (written *Miranda* warnings alone were sufficient to advise a deaf defendant of his rights) *See also United States v. Bailey*, 468 F.2d 652 (5th Cir. 1972) ("We are merely unwilling to hold as a matter of law that a printed card, read by a person shown to have understood the warnings, cannot satisfy *Miranda*.").[2] The critical inquiry for the Court is whether, under the facts and circumstances, the waiver was voluntarily and knowingly made. The Court finds that it was here.

---

[2]The Court notes that it gave counsel for both sides time to submit post-hearing briefing on this issue, and only the Government offered case law in support of its position. *See* Dkt. 63.

Defendant was literate and educated and knew what he was signing.

None of the testimony presented shows that Defendant unambiguously requested counsel or in any way articulated a desire to have counsel present such that Menser or other officers would have understood any statement by Defendant as a request for an attorney. Even if he asked whether he needed an attorney, he was given written warnings and proceeded nonetheless. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994).

Defendant knowingly and voluntarily waived his rights prior to making the oral and written statements he now seeks to suppress. "It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily." *U.S. v. Mendenhall*, 446 U.S. 544, 555-556 (1980); *see also United States v. Galberth*, 846 F.2d 983, 988 (5th Cir. 1988) ("...where the suspect certainly was aware that incriminating evidence would be disclosed by a search of her carry-on bag, the fact that [a defendant] acted against her own self-interest by consenting to the request of the officer to produce her airline tickets and identification and subsequently consenting to the search of her person is immaterial to the issue presented in her motion to suppress the fruits of the search.").

The record before the Court demonstrates that Defendant made a knowing and voluntary waiver of his *Miranda* rights, and was not coerced or threatened by law enforcement officers to do so. Therefore, there is no basis for suppression.

For these reasons, the Court recommends that Defendant's Motion to Suppress Evidence (Dkts. 51 & 52) be DENIED.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C.A. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 19th day of October, 2015.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE